EDWARD F. DAVIS v. H. W. GIDDINGS ET AL.

[FILED SEPTEMBER 16, 1890.]

1. **Conditional Sale.** The evidence examined, and *held*, not to establish a conditional sale.

2. **The instructions** requested by the defendant, not being based upon the testimony, were properly refused.

ERROR to the district court for Gage county. Tried below before BROADY, J.

*R. W. Sabin,* for plaintiff in error, cited: *McCormick v. Stevenson,* 13 Neb., 72; *Romberg v. Hughes,* 18 Id., 581; *Rawson Mfg. Co. v. Richards,* 35 N. W. Rep. [Wis.], 40; *Thomas v. Richards,* Id., 42; *Hoagland v. Van Etten,* 22 Neb., 681.

*R. S. Bibb, contra.*

NORVAL, J.

This was an action of replevin, brought by the defendants in error to recover the possession of a bay mare which the plaintiff in error, as sheriff of Gage county had taken under a writ of attachment issued out of the county court of said county, in an action wherein one I. L. Curley was plaintiff and A. N. Wilcox was defendant. The case was tried before a jury, who found the right of property and right of possession to be in the plaintiffs below.

The first assignment of error is that the verdict is not sustained by the evidence. It is claimed by the plaintiff in error that in May, 1886, the mare was sold by one of the defendants in error, H. W. Giddings, to Wilcox upon certain conditions, and that neither the judgment creditor, Curley, nor the sheriff, at the time the mare was attached, had any notice of the conditions of such sale. On the part of the defendants in error it is urged that the mare was owned by them, and that Wilcox never bought or owned her. The only testimony bearing upon the question of ownership was given by H. W. Giddings. He testified that the mare was the property of the defendants in error. His explanation of how the mare came into the possession of Wilcox is as follows:

"About the 20th of May, 1886, Wilcox came to me and wanted to buy a team; I could not spare a team; I told him if he could get along a week or ten days I could spare one critter; in a few days he came back, and he had lost one horse and he said he wanted one horse badly to work on his mill that he ground mortar for brick. I told him I had one, if it suited, I could spare after the 1st of May, but I did not know whether it would suit him; it was rather an inferior critter about some business, work well some places, and some it would not; I told him I would let him try it and if it suited him he might have it for so much; he appointed a day I should bring it over, which I did; we hitched it up and put it on the sweep and I told him I thought it would work all right; I think it was about nine o'clock we hitched on, and I staid until about eleven; he seemed to be satisfied it was all right, and in case it was all right he said he would give me $90 for it and give E. C. Saulsbury for security for sixty days; he rather pay the money, he had it earned but could not get it then, and if I would get along with that he would take it. Well, about the time we got ready to leave, Saulsbury came in a buggy—this was on the 10th day of June, but we had

talked about the way it should be paid in case the critter suited him, before that several days. Saulsbury was called to sign the note, and he had quite a long talk with this gentleman, and he refused to sign it; the man said he didn't know what he was going to do, he wanted a horse and I wanted my pay, and he proposed to give me a mortgage on the horse for that amount and wait on him sixty days; I told him I could not do that, that he owed me then considerable money and I wanted it, and if I couldn't get any money on the horse I proposed to keep the horse; he said he didn't know but he might pay me some the next week, I think this was Tuesday or Wednesday, and he said by Saturday I will let you know what I can do; I left with this understanding if he paid me what he owed me and made enough more to make fifty dollars—he finally agreed to pay me $25 on this mare and give me a note for the balance back.

Q. What was he to do in the meantime?

A. In case he did do that he was to pay me twenty-five cents a day for the use of this horse, and if he did I was not to receive anything from this time until he did that business.

Q. State whether or not he ever paid any money.

A. On this horse? No, sir.

Q. Did he ever give that note and mortgage?

A. No, sir.

\*        \*        \*        \*        \*        \*        \*

Cross-examination:

Q. You and Wilcox agreed on the price?

A. Yes, we didn't disagree on anything.

Q. What was the price?

A. Ninety dollars.

Q. Under that agreement you left the horse in his possession?

A. That is the price named.

Q. Under the agreement that he should give you a note in the future, you left the horse with him?

A. No; the agreement was he was to pay me $90; twenty-five dollars in cash and the balance a note to make it up to $90.

Q. You said that he was to give you a note with Saulsbury on it?

A. He was to give me $90 for the mare.

Q. He was to give you a note of $90 on Saulsbury?

A. That was the first contract.

Q. And under that you left the horse in his possession?

A. No, sir.

Q. Do you mean to say Saulsbury was there the day you took the horse over?

A. Yes, he was there and failed to sign the note.

Q. Then you made another agreement with him?

A. I was going to take the mare home.

Q. Then you left it there under the agreement that he was to pay you $25 and give a mortgage on the mare for the difference?

A. Here is what I done. When he failed to give that note with the man as security, I asked if he could pay some money, and I would sell the mare on time if he paid enough money, and he said he couldn't do it, he hadn't enough money. I said, "Won't Saulsbury get the money and let you have $24?" He says, "I don't know just how I stand with Saulsbury; we are in rather a muss about brick and I don't know what damage he is going to call on me for;" he says, "I will tell you what I will do, I will pay you what I can." What he would do he said he would do by the first of July. I says, "If you can pay me enough money now so I am sure of the balance you and I can trade yet." He asked what I would do. I says, "Pay what you owe me now, about $18 or $19, and enough to make it $50, or $25 on the mare, and then I will take a note and your brother-in-law for security."

Q. Was there any time fixed?

A. He was to do that by the first day of July.

\*        \*        \*        \*        \*        \*        \*

Q. And if he didn't it was to be your mare?

A. If he didn't do it, it was to be my mare and he was to pay for the use of it.

Q. Well, under that agreement you left the mare in his possession?

A. I left the mare in his possession.

Q. As I understand, if he came up to the agreement it was a trade, and if he did not it was not a trade?

A. If he filled that agreement it was a trade, if he didn't it was not a trade, the horse was mine; that was my understanding and I know it was his.

The testimony also shows that Wilcox absconded about the 23d or 24th day of June, leaving the mare in controversy on the place where he had resided, and that she was immediately attached to pay a claim against Wilcox. The testimony falls very far short of establishing a conditional sale. There was but an offer to sell, and Wilcox had until July 1 to comply with the terms of the proposition by paying $25 in cash and giving a secured note for the balance of the agreed price. Wilcox having never accepted the offer, no title to the mare ever passed to him. She was therefore not subject to attachment for the debts of Wilcox.

Complaint is made of the refusal of the court to give certain instructions requested by the plaintiff in error. The first request was as follows:

"The court instructs the jury that if they believe from the evidence that the plaintiffs made a conditional sale of said horse in controversy to the attachment debtor, A. N. Wilcox—that is, in the fore part of June, 1886, made a contract of sale to said Wilcox of said horse upon condition that he (Wilcox) would on the first day of July following pay plaintiffs twenty-five dollars and give plaintiffs his secured note for the difference between that and ninety

dollars in payment of said horse, but with the further
agreement between them that the ownership of the horse
should remain in plaintiffs until said Wilcox should pay
said money and give said note, and in case he should do so
by the first of July, as above stated, the horse should be his
property, but if he did not, to pay twenty-five cents a day
for the use of her while he had her, and that thereupon the
plaintiffs delivered the possession of said horse under said
agreement to said Wilcox—the court instructs you that if
you find these facts to exist from the evidence, that this
was a conditional sale of said horse from plaintiffs to said
Wilcox; and the court further instructs you that if you
find from the evidence said conditional sale to exist as
above set forth, and find from the evidence that the de-
fendant, as sheriff, levied the attachment in evidence on
said horse on the 28th day of June, 1885, while the said
property was still in the possession of said Wilcox under
said agreement, without notice on the part of the sheriff
or I. L. Curley, the attachment creditor, of any claim of
ownership to the horse by plaintiffs, then you should bring
in a verdict for the defendant."

It is apparent that it would have been error to have
given this request.  It, in effect, held that the evidence es-
tablished a conditional sale and that Wilcox had possession
of the mare under such an agreement.  As has already
been stated no such an inference could properly be drawn
from the testimony.

The plaintiff in error's second request was an instruction
to find for the defendant.  Under the testimony the de-
fendant was not entitled to have the jury so instructed.
Instead of the evidence being all on the side of the defend-
ant, it fully sustained the position of the plaintiffs below.

The third request of the plaintiff in error, which was
denied, was in language as follows:

"The court instructs the jury that actions must be pros-
ecuted in the name of the parties in interest, and the evi-

C., B. & Q. R. Co. v. Kriski.

dence in this case having disclosed the fact that the plaintiff Harvey Giddings, at the commencement of this suit, had no interest in the property in controversy more than being the husband of the real party in interest, the court instructs you the plaintiffs were improperly joined, and must fail. You are therefore directed to bring in a verdict for the defendant."

There is in the bill of exceptions testimony tending to show that the mare was owned jointly by both of the plaintiffs, and there is likewise testimony from which the inference could be drawn that Mrs. Giddings was the sole owner. In view of this conflict in the testimony the court had no right to assume in an instruction that one of the plaintiffs, Harvey Giddings, had no interest in the property. It was for the jury to say, under all the testimony, who owned the property at the commencement of the action.

Finally, it is urged that the court erred in refusing to submit special findings to the jury. It nowhere appears in the record before us that the defendant made a request for special findings. This point, therefore, cannot be considered. The judgment is

AFFIRMED.

THE other judges concur.